IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| HOWARD SNIDER, | ) | |
| | ) | 7:11CV5003 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM AND ORDER |
| MICHAEL ASTRUE, Commissioner of | ) | |
| the Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This is an action for judicial review of a final decision of the Commissioner of the Social Security Administration (the "Commissioner"). The plaintiff, Howard Snider, appeals the Commissioner's decision denying his application for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381 et seq.

On February 20, 2008, Snider filed an application for SSI benefits alleging he had been unable to work due to a disabling condition beginning November 1, 2007. Filing No. 10, Administrative Record ("Admin. R.") at 127. He stated he was disabled due to chronic obstructive pulmonary disease ("COPD"), cirrhosis of the liver,[1] hepatitis C, portal hypertension,[2] an enlarged spleen, kidney problems, acute hemorrhoids, diabetes, gastroesophageal reflux disease ("GERD"), rotator cuff damage, back problems, and acute

---

[1]Cirrhosis is "[e]ndstage liver disease characterized by diffuse damage to hepatic parenchymal cells, with nodular regeneration, fibrosis, and disturbance of normal architecture; associated with failure in the function of hepatic cells and interference with blood flow in the liver, frequently resulting in jaundice, portal hypertension, ascites, and ultimately biochemical and functional signs of hepatic failure." STEDMANS 81190.

[2]Portal hypertension is hypertension in the portal system as seen in cirrhosis of the liver and other conditions causing obstruction to the portal vein. Stedmans 193510. Hypertension is "high blood pressure; transitory or sustained elevation of systemic arterial blood pressure to a level likely to induce cardiovascular damage or other adverse consequences." Id.

groin pain.  *Id.* at 127.  He has previous work experience as a dishwasher, farm worker, pig feeder and hay chopper operator and scrap metal worker.  *Id.* at 143.

The Commissioner denied benefits initially and on reconsideration.  *Id.* at 69-75. An administrative law judge ("ALJ") held a hearing by video conference on December 8, 2009.  *Id.* at  27-54.   The ALJ found that Snider was not disabled within the meaning of the Act.  *Id.* at 9-17.  The Appeals Council denied Snider's request for review.  *Id.* at 1-5. Snider now seeks judicial review of the ALJ's determination as it represents the final decision of the Commissioner.

**BACKGROUND**

At his administrative hearing on December 8, 2009, Snider testified he was born on October 22, 1956, is about six feet one inch tall and weighs 240 pounds.  *Id.* at 32.  Snider is divorced and now lives with his father.  *Id.* at 32.  Snider had been incarcerated on a felony conviction from 2003 until 2007.  *Id.* at 33.   Snider does not receive financial assistance benefits except he does have assistance with medications and emergency medical care.  *Id.* at 32-33.   He testified that he can take care of his own personal needs and grooming and also does some household chores such as washing dishes, cooking, and doing laundry.  *Id.* at 34.  He uses a chair near the stove to cook and only spends about fifteen minutes washing dishes before he sits due to back discomfort.  *Id.* at 44-45. He testified he raises roller pigeons as a hobby and cares for them by feeding them once a day for about ten to fifteen minutes.  *Id.* at 34, 44.  He stated he cannot walk more than two or three blocks without being short of breath and can only lift ten to fifteen pounds, anything more causes back pain and exacerbates his hemorrhoids.  *Id.* at 41-42, 44.  He

2

further testified he can only sit for approximately an hour and has to continue to shift his position due to back discomfort, and can stand for only 15 minutes. *Id.* at 42. He stated he naps for several hours each day. *Id.* at 45.

He also testified that he does not spend time socializing or engaging in social activities except visiting with family. *Id.* at 34. Snider testified he generally has a lot of back pain, which comes and goes every day, and lifting and standing aggravate his back pain. *Id.* at 38. Snider stated he had not been tested for hepatitis C or cirrhosis in a long time because he could not afford it. *Id.* at 39. He testified that at the time of the hearing he was taking the following prescription medications: Aldactone, Lasix, Prilosec, Pancreases, and a nasal spray. *Id.* at 41. He also complained of fatigue and described the symptoms associated with his liver problems as feeling tired a lot and suffering swelling in his hands and legs. *Id.* at 39. He testified that "water pills" alleviate the swelling somewhat. *Id.* He also stated that his stomach causes him pain "sometimes" and his pancreas hurts "on [his] right side quite a bit." *Id.* at 40.

Thomas C. Dashelette, a vocational expert, also testified at the hearing. *Id.* at 48-51. He was asked whether a hypothetical individual who could lift and carry fifty pounds occasionally and twenty-five pounds frequently; sit, stand, or walk for six hours in an eight-hour work day; and occasionally stoop, crouch, and crawl, provided that he avoids concentrated exposure to dust, gases, and fumes, could find work in the national economy. *Id.* at 49-50. Mr. Dashelette appeared to give the opinion the individual could engage in some of Snider's past work. *Id.* at 49. The ALJ posed a second hypothetical with the same restrictions except that the individual could lift and carry only twenty pounds occasionally and ten pounds frequently. *Id.* at 50. Mr. Dashelette testified that such an

3

individual could not engage in any of Snider's past work, but could perform other jobs that exist in the national economy, such as employment as a bagger, garment sorter, and grader. *Id.* at 50-51. Mr. Dashelette stated a substantial number of jobs were available at the light level, but two-thirds fewer jobs would be available if the individual would need a sit-or-stand option. *Id.* at 51. Finally, Mr. Dashelette testified that no work would be available to an individual who required an additional two to four thirty-minute breaks per day. *Id.* Mr. Dashelette also testified that no work would be available to an individual who required a break every two hours or was limited to sedentary work with a more significant limitation on standing and walking. *Id.* at 52.

Snider's medical records show that he received medical care from the U.S. Bureau of Prisons ("BOP") while incarcerated from 2003 to 2007. *Id.* at 195-265. He has been diagnosed with hepatitis C, an inflammatory disease that disrupts liver structure and function. *Id.* at 33, 253. The hepatitis C diagnosis was confirmed by laboratory tests. *Id.* at 209. On October 8, 2003, Snider's laboratory testing indicated liver function values of 46 IU/L AST, 86 IU/L ALT, and 4.0 g/dl serum albumin.[3] *Id.* The AST and ALT values were considered abnormally high, but the albumin level was in the normal range.[4] *Id.* Throughout 2004, those liver function values remained at similar levels, though his alkaline phosphate and bilirubin levels went up, and his albumin fell below the normal reference range. *Id.* at 199, 206, 210, 245, 251.

---

[3]AST (aspartate aminotransferase) and ALT (alanine aminotransferase) are enzymes used to assess tissue injury due to liver damage. Mosby's Dictionary of Medicine, Nursing & Health Professionals 60, 151 (7th ed. 2006).

[4]The range considered normal for AST is from 10 to 37 IU/L; the range considered normal for ALT is 8 to 40 IU/L; and the range considered normal for serum albumin is 3.5 to 5.0 g/dl (Admin. R. 209).

4

While incarcerated, Snider injured his back and suffered an inguinal hernia while moving logs as part of a work project in prison. *Id.* at 195-196, 247-249. Snider continued to receive treatment for those issues and was referred to a urologist or general surgeon for abdominal pain associated with the hernia. *Id.* at 198. Records show that he injured his shoulder in November 2004, and again in January 2005, and was prescribed pain medication. *Id.* at 241-242, 246, 249. BOP records show limited range of motion and tenderness in his shoulder. *Id.* at 245, 237. As a result of his injuries, Snider was restricted to lifting only five-pounds. *Id.* at 250. Additionally, correction officials were instructed not to handcuff him behind his back because of a rotator cuff tear. *Id.* at 216, 225.

He underwent hernia repair surgery in January 2005. *Id.* at 212, 221, 241-244, 250. In September 2005, Snider reported he was still having pain at his hernia site when lifting. *Id.* at 206, 235. He reported pain at the hernia site at the level of 8 to 9 on a scale of 1 to 10. *Id.* at 230. At that time, he was indefinitely restricted to lifting no more than fifteen pounds, and in November 2006 he was restricted from bending and stooping, and instructed to lower the amount of lifting. *Id.* at 221, 224, 229, 235.

Correctional facility medical providers continued to observe Snider's hepatitis C. *Id.* at 199-201, 206, 211, 237, 262. In January 2005, laboratory tests indicated liver function values of 57 IU/L AST, 119 IU/L ALT, and 4.0 g/dl serum albumin, and in September 2005 liver function tests were again elevated (369 IU/L AST, 608 IU/L ALT, and 3.9 g/dl serum albumin). *Id.* at 206, 211.

In February 2006, his AST and ALT liver function values had fallen (109 IU/L AST, 144 IU/L ALT), but his serum albumin remained 3.9 g/dl. *Id.* at 203. The examiner noted

5

Snider's levels were one-third of what they had been on previous examination and opined Snider was asymptomatic with regard to his liver problem, but recommended further testing the following May. *Id.* at 233. In May 2006, Snider's laboratory results indicated AST and ALT liver function values had again increased (178 IU/L AST, 252 IU/L ALT), and his serum albumin had decreased to 3.4 g/dl, below the normal range of 3.5 to 5.0 g/dl. *Id.* at 205. In August 2006, Snider was considered for hepatitis C treatment and an HCV RNA test showed Snider's viral load was 8,070,000 IU/ml and his log IU/L was 6.9.[5] *Id.* at 204, 230. The record contains no indication Snider received treatment or repeated an HCV RNA test while incarcerated.

Snider's September 2006 laboratory results indicated liver function values of 118 IU/L AST, 147 IU/L ALT, and 3.7 g/dl serum albumin. *Id.* at 202. In November 2006, Snider's liver enzymes were elevated. *Id.* at 228. In May 2007, laboratory results showed Snider's liver function values were 79 IU/L AST, 73 IU/L ALT, and 3.3 g/dl serum albumin. *Id.* at 199. In June 2007, while still incarcerated, Snider was also diagnosed as borderline diabetic, but did not want to start taking oral medications. *Id.* at 226.

In August 2007, Snider was released to a halfway house. *Id.* at 284-86. In November 2007, Snider was treated at Jennie Edmundsen Hospital in Council Bluffs, Iowa. *Id.* at 314-339. He presented at the emergency room complaining of acute abdominal pain and was admitted to the hospital for three days. *Id.* at 316. Diagnoses on admission were: acute pancreatitis; history of hepatitis C; thrombocytopenia; hyperbilirubinemia; altered liver function testing; splenomegaly; inflamed bowel by CAT scan; cirrhosis; hemangioma of the

---

[5]Reference ranges for normal values are less than 50 IU/ml and less than 1.7 log IU/ml. *Id.* at 230.

liver; rule out gastroenteritis; history of borderline diabetes; and portal hypertension.  *Id.* at 315.  He was treated for pancreatitis.  *Id.* at 283-285, 315-317, 321-324.  On discharge, abdominal pain, pancreatitis, and gastroenteritis were resolved, but "acute hemorrhoids, symptomatic," splenomegaly and portal hypertension were noted.  *Id.*

Snider's liver function was tested  on each of the three days he was in the hospital: AST levels were 136 IU/L, 123 IU/L, and 121 IU/L, and ALT levels were 174 IU/L, 159 IU/L, and 147 IU/L.  *Id.* at 326.  Snider's albumin levels successively were 3.4 g/dl, 3.1 g/dl, and 3.0 g/dl.  *Id.* at 325.  Radiology reports showed a "[s]mall volume of pelvic ascites[6] seen dependently."  *Id.* at 316.  An ultrasound of the abdomen showed "mild wall thickening and pericholecystic fluid" and confirmed the presence of ascites.  *Id.* at 316.  On November 21, 2007, his International Normalized Ratio ("INR"), measuring the speed of his blood coagulation, was 1.2, which is at the high end of the normal range of .08 to 1.2.  *Id.* at 290, 315.  Ascites were confirmed by X-ray.  *Id.* at 316.  Snider also underwent an abdominal ultrasound that demonstrated evidence of cirrhosis, low portal venous flow, indicative of portal venous hypertension.  *Id.* at 323.  A CT scan showed inflammatory changes in the fat around the pancreas.  *Id.*  An MRI showed a possible hemangioma of the liver.  *Id.* at 316.

On January 1, 2008, Snider returned to the emergency room, complaining of severe abdominal pain that persisted for a week.  *Id.* at 281.  He was admitted and hospitalized until January 7, 2008.  *Id.* at 281, 283.  A radiology report showed that abdominal pelvic ascites had increased since the previous November.  *Id.* at 300.  Snider's treating

---

[6]Acites is "[a]ccumulation of serous fluid in the peritoneal cavity."  Stedman's Medical Dictionary (27th ed. 2000), available at STEDMANS 34140 (Westlaw) (hereafter, "STEDMANS").

physician concluded that he suffered "probable cirrhosis of the liver . . . with a history of chronic hepatitis C" with "moderate ascites." *Id.* at 287, 300.  Snider's albumin levels were 3.4 g/dl on January 1, 2008, and 2.7 g/dl on January 3, 2008, and Snider's AST and ALT levels were both 98 IU/L on January 3, 2008.  *Id.* at 287, 292.  Snider underwent a paracentesis.[7]  *Id.* at 281.  At that time, Snider's INR was 1.3, which the doctor noted was within normal limits.  *Id.* at 281, 290.  A consulting gastroenterologist noted an impression of "[p]robable cirrhosis of the liver by CAT scan— with ascites and splenomegaly with a history of chronic hepatitis C."  *Id.* at 287.

A serology report showed active infection with hepatitis C and laboratory work showed a viral load of 1,310,000 IU/ml.  *Id.* at 294-95.   The doctor noted Snider had a history of persistent elevation of liver function values due to his hepatitis C condition.  *Id.* at 283, 286, 294.  A CT scan showed abdominal ascites had increased.  *Id.* at 300.  Snider also had an endoscopy and colonoscopy.  *Id.* at 288-89.  The endoscopy revealed a deep ulcer and "a question of grade 1 esophageal varices."[8]  *Id.* at 288.

On January 23, 2008, Snider was again admitted for treatment of swelling in his legs and pain and distention of his abdomen.  *Id.* at 268.  The examining physician noted swelling in the lower extremities and increasing distention of the abdomen and provided a diagnosis of "bilateral lower extremity swelling and ascites . . . secondary to portal hypertension and cirrhosis of the liver."  *Id.* at 268, 272.  Snider's liver function values were

---

[7]Paracentesis is '[t]he passage into a cavity of a trocar and cannula, needle, or other hollow instrument for the purpose of removing fluid; variously designated according to the cavity punctured." STEDMANS 29640.

[8]Varices are:  1. Dilated veins; 2. An enlarged and tortuous vein, artery, or lymphatic vessel. Stedmans 431920.  Esophageal varices are longitudinal venous varices at the lower end of the esophagus as a result of portal hypertension; they are superficial and liable to ulceration and massive bleeding.  *Id.*

118 IU/L AST, 130 IU/L ALT, and 3.1 g/dl albumin.  *Id*. at 268, 274.  A chest X-ray showed mild bowel obstruction, but no acute pulmonary abnormality.  *Id.* at 275.  Snider was prescribed diuretics to decrease pain and swelling.  *Id.* at 268-269, 272.  Snider was discharged after three days with a principal diagnosis of bilateral lower extremity swelling and ascites and secondary diagnoses of hepatitis C, cirrhosis of the liver, portal hypertension, and glucose intolerance, gastroesophageal reflux disease, chronic obstructive pulmonary disease, and thrombocytopenia.[9]  *Id.* at 268.

Snider was treated in the emergency room of Good Samaritan Hospital in Kearney on March 18, 2008, for hemorrhoids.  *Id*. at 355.  He was seen at Plum Creek Medical Clinic on March 28, 2008, by Dr. Mark R. Jones who diagnosed chronic airway obstruction, not otherwise classified; unspecified hemorrhoids without mention of complication; cirrhosis of the liver without mention of alcohol; portal hypertension, and esophageal reflux.  *Id*. at 357.  Snider was prescribed Aldactone, Darvocet, Lasix, Albuterol, Protonix and TED hose. *Id*.  Abdominal examination showed "no obvious ascites," but "does have prominent veins in abdominal wall."  *Id*.  The examining physician noted Snider was "in limbo until he gets some kind of assistance."  *Id.*  Snider was treated again at Plum Creek Medical Center for pancreatitis on June 6, 2008, and for COPD on November 25, 2008, and January 30, 3009.  *Id.* at 364-68.  The record also shows that in April 2008, Snider was instructed to minimize lifting and straining because of hemorrhoids.  *Id.* at 370.  His treating physician noted, "unfortunately, because of his liver disease there is nothing more that can be done

---

[9]Thrombocytopenia is "[a] condition in which there is an abnormally small number of platelets in the circulating blood."  STEDMANS 408760.

for the hemorrhoids," stating "the risk of surgical intervention would be far too high with considerable risk of heavy bleeding." *Id*. at 370.

On May 15, 2009, an examination showed mild swelling, numbness and pain in his extremities, trace edema in extremities, mild depression, anxiety and fatigue. *Id.* at 368. Doctor's notes indicated "would be careful with pain [medications] in this [patient], when he gets coverage would consider eval[uation of carpal tunnel syndrome], await labs, liver [enzymes] still elevated which is hard to explain, further eval[uation] with hepatitis panel . . . finances now the limiting factor; has not used alcohol in years." *Id.* Metabolic lab work was performed and his treating physician's final diagnosis was "Cirrhosis, Alcoholic Liver." *Id.* Snider's serum albumin was 2.9. *Id.*

On March 17, 2008, Jerry Reed, M.D., a Social Security Administration consulting physician, reviewed Snider's medical records up to that date and performed an assessment of Snider's physical Residual Functional Capacity ("RFC") in connection with his application for benefits. *Id.* at 340-351. Dr. Reed found that Snider could frequently lift 50 pounds and occasionally lift 25 pounds, could stand, walk or sit for a total of six hours in an eight-hour workday, perform unlimited pushing and/or pulling, occasionally climb ramps, stairs, ladders, ropes, and scaffolds; and occasionally balance, stoop, kneel crouch and crawl. *Id.* at 341-42. He further found that no manipulative limitations nor visual limitations had been established. *Id.* at 343. Dr. Reed's assessment included a three-page commentary describing Snider's medical history and explaining the rationale for the residual functional capacity determination. *Id.* at 347-351.

In the narrative, Dr. Reed focused on Snider's liver condition, noting that despite the higher than normal laboratory testing results, such results remained fairly constant over

time. *Id.* at 349-351.  He noted that Snider's medical records "presented a very confusing picture in that there does not appear to be any question that his primary diagnosis is that of hepatitis C."[10]  *Id.* at 348.  He noted there was documentation that Snyder had "a rather persistent elevation of enzymes."  *Id.*  Additionally, Dr. Reed noted that Snyder "does always show some degree of splenomegaly and has shown rather persistent thrombocytopenia," but that he had received no treatment for it.  *Id.* at 349.  Noting no further evaluation as to why Snider had the thrombocytopenia, Dr. Reed "assumed [it] was on the basis of hypersplenism."[11]  *Id.*  He further noted that an upper GI endoscopy had revealed grade 1 suspicion of varices and that Snider had apparently had a gastric ulcer that had been treated with medications.  *Id.*

Significantly, Dr. Reed noted that diagnostic studies that related to hepatitis C showed "a viral load of 1,310,000, and a log of 6.1, with a genotype of 1A."  *Id.* at 349.  He characterized hepatitis C as a relentless disease, and stated that "oftentimes patients respond to some form of antiviral therapy," but that genotype 1A has a much lower response rate than other  genotypes.  *Id.* at 350.  Dr. Reed noted that hepatitis C is "characterized by ongoing hepatic necrosis as measured by the hepatic enzymes" that many times "ultimately leads to hepatic repair but at the risk of scar formation or fibrosis and cirrhosis."  *Id.*  Further, Dr. Reed noted that a number of CAT scans "do reveal the possibility of cirrhosis of the liver," but stated "this is a biopsy diagnosis that has not been

---

[10]He also stated it was "very confusing" that Snider listed his address in Overton, Nebraska, but was treated in Council Bluffs, Iowa, apparently not noticing the references to a halfway house in the records.  *Id.* at 349.

[11]Hypersplenism is "[a]ny of a group of conditions in which the cellular components of the blood or platelets are removed at an abnormally high rate by the spleen, resulting in low circulating levels." STEDMANS at 193400.

11

accomplished on this claim." *Id.* He also found "no good documentation of portal hypertension," although he stated that "the fact that he has had some hemorrhoids may raise that question and at the same time the absence of demonstrable varices on the upper GI are used against the presence of significant portal hypertension." *Id.* He also stated another risk "besides the cirrhosis of the liver and ultimate liver failure and perhaps even transplantation is the risk of development of hepatocellular carcinoma or hepatoma. This is not documented in this particular client at the present time and may actually be too early in the course of the disease." *Id.* Dr. Reed concluded stating:

> At the present time, it is difficult to assess how all this impacts him at the present time. As mentioned, the business about the back is poorly documented the business about the shoulder is similarly so. The only thing we are absolutely certain of is the diagnosis of hepatitis C in the ongoing enzymatic determinations. They have stayed about the same and the viral load has stayed about the same terms of the log. That is noted on this the claimant at the present time appears to be capable of carrying out the functions as outlined in the current RFC. But perhaps this may all change.

*Id.* at 351. Dr. A. R. Hohensee, another medical consultant, reviewed the records and affirmed Dr. Reed's assessment as written. *Id.* at 360.

The ALJ concluded Snider was not disabled under the Act and was not entitled to any SSI disability benefits.[12]   *Id.* at 17. The ALJ found Snider had not engaged in any substantial gainful activity since February 20, 2008. *Id.* at 11. He found Snider had the following severe impairments: hepatitis C, cirrhosis, diabetes, hemorrhoids, history of umbilical hernia, portal hypertension, lumbar degenerative joint disease, and chronic obstructive pulmonary disease. *Id.* He then determined that Snider did not have an

---

[12]The ALJ erroneously framed the issue as whether Snider was eligible for benefits as a disabled individual under § 1614(a)(3)(A) of the Act since February 20, 2008, the date the application was filed, rather than the alleged onset date of November 1, 2007. *See id.* at 9.

impairment or combination of impairments that meets or medically equals a listed impairment. *Id.* at 11. The ALJ stated that he had "considered Listing 5.05 pertaining to chronic liver disease," but found the plaintiff did not have "hemorrhaging, ascites with required lab results, peritonitis, hepatorenal syndrome, hepatopulmonary syndrome, intrapulmonary arteriovenous shunting, hepatic encephalopathy, or end state liver disease as required by the Listing." *Id.* at 11 (emphasis added). He found however, Snider's residual functional capacity was limited such that Snider could only

> lift and carry 20 pounds occasionally and ten pounds frequently. He is able to stand and/or walk for a total of six hours and sit for six hours in an eight-hour workday. He is able to stoop, crouch, and crawl occasionally. He must avoid concentrated exposure to dust, gases, and fumes.

*Id.* at 12.

The ALJ did not credit the plaintiff's testimony with respect to the severity of his subjective complaints. *Id.* at 13. He noted that the evaluation of subjective complaints is a two-step process: first, determining whether there is objective medical evidence of an impairment that could reasonably be expected to produce the claimant's symptoms; and second, whether the plaintiff's testimony concerning the intensity, persistence and limiting effects of the symptoms was credible. *Id.* He made no finding regarding objective medical evidence, but nonetheless found the plaintiff's testimony "was not persuasive or convincing." *Id.* at 14. He discounted Snider's testimony regarding pain and fatigue, noting that Snider testified he did "some household chores, washes dishes, cooks, does laundry, and sometimes shops, but does not do much yard work" and "said he has no social activities and does not have many friends, but visits with family." *Id.* Further, he noted that Snider "stated that he is supposed to have his cirrhosis and hepatitis tested every three months, but he does not have the means to pay for it." *Id.* The ALJ referred to the *Polaski*

13

standards for evaluation of subjective complaints and stated, "weighing all relevant factors, the Administrative Law Judge finds that the claimant's impairments are not as limiting as alleged." *Id*. He then noted that objective evidence showed only a mild back impairment and contained nothing to substantiate a shoulder impairment. *Id.* at 15. Concluding that Snider "performs a wide range of daily activities that are inconsistent with disabling pain," and noting that Snider's abdominal pain and swelling in extremities was controlled by medication, the ALJ added that "Snider's conviction and five-year prison term for manufacturing methamphetamines further diminishes his credibility." *Id.* at 15. The ALJ stated the residual functional capacity assessment was supported by objective evidence showing only "mild impairments and minimal treatment." *Id.*

The ALJ next assessed Snider's job history and potential employability and determined Snider could not perform any past relevant work. *Id.* at 15. The ALJ relied on the testimony of the vocational expert, at step five of the sequential analysis, to sustain the Commissioner's burden of showing that there were other jobs in the national economy that a person of Snider's age, education, and RFC could perform. *Id.* at 16. The ALJ determined that Snider retained the RFC for unskilled light labor and could perform jobs such as a bagger, garment sorter, and grader. *Id.*

Snider appeals the Commissioner's decision, asking that the decision be reversed and benefits awarded because: (1) his condition meets or equals Listing 5.05B based on his liver function deterioration and (2) the ALJ erred by failing to obtain a medical expert opinion on the issue of equivalency.

## LAW

A district court has jurisdiction to review a decision to deny disability benefits under 42 U.S.C. § 405(g). *See also* 42 U.S.C. § 1383(c)(3). A district court must determine

whether the ALJ's decision complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole. *Johnson v. Astrue*, 628 F.3d 991, 992 (8th Cir. 2011). Substantial evidence is defined as relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Martise v. Astrue*, 641 F.3d 909, 921 (8th Cir. 2011). However, "substantial evidence on the record as a whole" requires a more scrutinizing analysis. *Id.* When determining whether substantial evidence exists, the court considers evidence that supports the Commissioner's conclusion, along with evidence that detracts from that conclusion. *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006). Further, the court reviews an ALJ's legal conclusions de novo. *See Miles v. Barnhart*, 374 F.3d 694, 698 (8th Cir. 2004).

In order to qualify for benefits under the Social Security Act and accompanying regulations, an individual must be disabled. *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. *Id.*; 42 U.S.C. § 1382c(a)(3)(A). To determine disability, an ALJ follows a familiar five-step process, considering: (1) whether the claimant was employed; (2) whether he or she was severely impaired; (3) whether his or her impairment was equal or equivalent to a presumptively disabling condition listed in Appendix 1 of Subpart P of the Social Security regulations ("the Listings"); (4) whether he or she could perform past relevant work; and, if not, (5) whether he or she could perform any other kind of work. 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a).

The burden is on the claimant to establish that his impairment or combination of impairments are severe. *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). Although the

requirement of severity is not an "onerous requirement," neither is it a "toothless standard." *Id.* at 708. An "impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Id.*; 20 C.F.R. § 404.1521(a). To qualify as disabled under a Listing, the claimant has the burden to establish his condition meets or equals all specified medical criteria. *See McCoy v. Astrue*, 648 F.3d 605, 611–12 (8th Cir. 2011).

To be presumptively disabled by reason of a liver disorder, a claimant must satisfy criteria set forth in the listing for digestive system disorders in 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 5.00. "Chronic liver disease is characterized by liver cell necrosis, inflammation, or scarring (fibrosis or cirrhosis), due to any cause, that persists for more than 6 months." *Id.* § 5.00(D)(1). Chronic liver disease "may result in portal hypertension, cholestasis (suppression of bile flow), extrahepatic manifestations, or liver cancer." *Id.* The regulations provide that "[s]ignificant loss of liver function may be manifested by hemorrhage from varices or portal hypertensive gastropathy,[13] ascites (accumulation of fluid in the abdominal cavity), hydrothorax (ascitic fluid in the chest cavity), or encephalopathy." *Id.* Also, "progressive deterioration of laboratory findings" are indicative of liver dysfunction. *Id.* Examples of chronic liver disease include chronic hepatitis and alcoholic liver disease. *Id.*, § 5.00(D)(3). Manifestations of chronic liver disease include symptoms such as "pruritis (itching), fatigue, nausea, loss of appetite, or sleep disturbances." *Id.* Further, Social Security regulations note that "symptoms of chronic liver disease may have a poor correlation with the severity of liver disease and functional ability." *Id.*, § 5.00(D)(3)(a). Signs of chronic liver disease include, but are not limited to: "jaundice, enlargement of the

---

[13]Gastropathy is any disease of the stomach. Stedmans 159640.

liver and spleen, ascites, peripheral edema, and altered mental status." *Id*. Laboratory findings relevant to chronic liver disease include:

> increased liver enzymes, increased serum total bilirubin, increased ammonia levels, decreased serum albumin, and abnormal coagulation studies, such as increased International Normalized Ratio (INR) or decreased platelet counts. Abnormally low serum albumin or elevated INR levels indicate loss of synthetic liver function, with increased likelihood of cirrhosis and associated complications. However, other abnormal lab tests, such as liver enzymes, serum total bilirubin, or ammonia levels, may have a poor correlation with the severity of liver disease and functional ability. A liver biopsy may demonstrate the degree of liver cell necrosis, inflammation, fibrosis, and cirrhosis. If you have had a liver biopsy, we will make every reasonable effort to obtain the results; however, we will not purchase a liver biopsy. Imaging studies (CAT scan, ultrasound, MRI) may show the size and consistency (fatty liver, scarring) of the liver and document ascites.

*Id.*, § 5.00(D)(3)(b) & (c); *see also* § 5.00(D)(6). Notably, "ascites or hydrothorax indicate significant loss of function due to liver disease." *Id.*, § 5.00(D)(6). Ascites or hydrothorax is evaluated under § 5.05(B).

Chronic viral hepatitis infections are also evaluated under § 5.05. *Id.*, § 5.00(D)(4)(a)(ii). Chronic viral hepatitis infection ranges widely on a spectrum "and includes an asymptomatic state; insidious disease with mild to moderate symptoms associated with fluctuating liver tests; extra hepatic matter manifestations; cirrhosis, both compensated and decompensated; ESLD [end stage liver disease] with the need for liver transplantation; and liver cancer." *Id.*, § 5.00(D)(4)(a). Similarly, treatment for chronic viral hepatitis infections varies considerably based on medication tolerance, treatment response, adverse effects of treatment, and duration of the treatment. *Id*. Also, chronic hepatitis C "may have significant extrahepatic manifestations in a variety of body systems," including skin disorders, neuropathy, and immune dysfunction. *Id.*, § 5.00 (D)(4)(d).

17

Under the Listings, evaluation of ascites or hydrothorax requires certain findings that must be present on at least two evaluations at least 60 days apart within a consecutive six-month period and despite continuing treatment as prescribed. *Id.*, § 5.00 (D)(6). The ascites or hydrothorax must be documented by either paracentesis or thoracentesis, or by "appropriate medically acceptable imaging or physical examination and one of the following (a) serum albumin of 3.0 g/dl or less; or (b) International Normalized Ratio (INR) of at least 1.5." *Id.*, § 5.05(B).

A finding that a claimant's impairment is not equal to a listed impairment does not end the inquiry. *Shontos v. Barnhart*, 328 F.3d 418, 424 (8th Cir. 2003). An impairment can be found to be medically equivalent to a listed impairment in Appendix 1 if it is at least equal in severity and duration to the criteria of any listed impairment. 20 C.F.R. § 404.1526. The determination of medical equivalence is based on medical evidence, supported by acceptable laboratory and clinical diagnostic techniques. *Id.* Whether the findings for an individual's impairment meet the requirements of an impairment in the Listings is usually more a question of medical fact than a question of medical opinion. Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner, Soc. Sec. Rul. 96-5P, 1996 WL 37418 (July 2, 1996). For cases at the administrative law judge or Appeals Council level, the responsibility for deciding medical equivalence rests with the administrative law judge or Appeals Council. 20 C.F.R. § 404.1526(e).

It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits. *Sims v. Apfel*, 530 U.S. 103, 111 (2000) (noting that "Social Security proceedings are inquisitorial rather than adversarial."). It is well settled that the ALJ's duty to fully and fairly develop the record includes the responsibility of ensuring that

the record includes evidence addressing the alleged impairments at issue from either a treating or examining physician. *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004) ("The ALJ possesses no interest in denying benefits and must act neutrally in developing the record"). The duty to develop the record extends to cases where the claimant is represented by counsel. *Id.* The ALJ's duty to develop the record in a Social Security hearing may include seeking clarification from treating physicians if a crucial issue is undeveloped or underdeveloped. *Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006); *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000) (holding that it was improper for an ALJ to rely on the opinions of reviewing physicians alone).

The determination of a claimant's RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis, i.e., eight hours a day, five days a week, or an equivalent work schedule. *Id.*, Soc. Sec. Rul. 96-8p (1996). RFC is not based solely on "medical" evidence; rather, the Commissioner must determine a claimant's RFC based on all of the relevant evidence, including medical records, observations of treating physicians and others, and an individual's own description of the limitations. *See McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000). When a claimant suffers from exertional and nonexertional impairments, and the exertional impairments alone do not warrant a finding of disability, the ALJ must consider the extent to which the nonexertional impairments further diminish the claimant's work capacity. *McGeorge v. Barnhart*, 321 F.3d 766, 768 (8th Cir. 2003). The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence. *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998).

The Medical-Vocational Guidelines, a grid that accounts for an individual's RFC and various other vocational factors, such as age and educational background, is included in the regulations to provide guidance at step five of the sequential analysis. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2. "Where the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled." *Id.*, § 200.00. If an impairment affects the claimant's ability to meet job demands other than strength, the Medical-Vocational Guidelines are not directly applied but "provide a framework to guide [the] decision." 20 C.F.R. § 404.1569a(d). Under the Medical-Vocational Guidelines, an individual who is "closely approaching advanced age"—that is, age fifty to fifty-four—is disabled if his maximum sustained work capability is limited to sedentary work as a result of severe medically determinable impairments and he has "limited or less" education or is a high school graduate or more without a recently completed education that provides for direct entry into sedentary work, and he has no past relevant work experience or only unskilled work experience. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.00(g) and Table 1.

A claimant's subjective complaints may be disregarded based on evidence in the record as a whole, but the ALJ may not discount subjective complaints of pain solely because they are not fully supported by objective medical evidence. *Ellis v. Barnhart*, 392 F.3d 988, 996 (8th Cir. 2005). When assessing the credibility of a claimant's subjective allegations of pain, the ALJ must consider the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions. *See Polaski*

*v. Heckler*, 739 F.2d 1320, 1322 (8th Cir.1984). When an ALJ rejects a claimant's complaints of pain, he or she must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the *Polaski* factors. *Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998). An ALJ is entitled to find a failure to seek medical attention is inconsistent with complaints of pain, but a lack of financial resources may in some cases justify the failure to seek medical attention or failure to follow prescribed treatment. *See Benskin v. Bowen*, 830 F.2d 878, 884 (8th Cir. 1987); *Brown v. Heckler*, 767 F.2d 451, 453 n.2 (8th Cir. 1985).

A vocational expert's testimony constitutes substantial evidence only when it is based on a hypothetical that accounts for all of the claimant's proven impairments. *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010). "The hypothetical 'need not frame the claimant's impairments in the specific diagnostic terms used in medical reports, but instead should capture the concrete consequences of those impairments.'" *Id.* (quoting *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006) (internal quotation omitted)).

## DISCUSSION

The court finds the ALJ erred in determining that Snider's impairment did not meet or equal the Listing for the presumptively disabling condition of chronic liver disease with ascites. The medical evidence documents Snider's diagnosis of hepatitis C at least since 2003. He has a long-standing history of consistently elevated and progressively worsening liver enzymes. Lab work shows a progressive deterioration of Snider's liver function from 2003 to 2007. Snider was hospitalized for manifestations of liver disease, including ascites, in November 2007 and again on two separate occasions in January 2008. On November 21, 2007, Snider's serum albumin value was at the presumptively disabling

21

threshold of 3.0 g/dl and ascites was documented by imaging and physical examination at that time.  On January 3, his serum albumin had fallen to 2.7 g/dl, below the presumptively disabling threshold of 3.0.  Doctors diagnosed ascites requiring paracentesis at that time.  These two episodes document the required presence of ascites with medically acceptable means, although they are not quite 60 days apart.  Snider was readmitted a few weeks later and again treated for increased swelling in his abdomen and extremities.  Although Snider's serum albumin was slightly above the 3.0 threshold at 3.1, Snider's physician, the same doctor who had treated him during his previous hospitalization, diagnosed ascites and alcoholic liver disease, relying in part on the paracentesis that had been performed in early January of that year.  The Listings do not specify that paracentesis must be performed at the time of the episode, only that the episode is documented by paracentesis.  The record shows that Snyder's ascites had worsened between January 1 and January 22, 2008.  His abdomen was distended, he had elevated liver function tests, and had bilateral edema up to his knees.

The court finds the medical evidence clearly demonstrates deterioration of Snider's liver function over the course of several years.  Significantly, objective medical evidence demonstrates numerous other manifestations of chronic liver disease such as portal hypertension, varices, gastropathy, pancreatitis, and decreased platelet counts.  Additionally, Snider has been diagnosed with chronic hepatitis C and laboratory analysis shows that the condition is of a genotype that is not receptive to treatment.

In finding that results of procedures and tests performed in early January 2008 could not be considered in connection with those performed in late January 2008, the ALJ performed an overly restrictive analysis.  The medical evidence of record shows that

Snider's condition meets the Listing or is at least medically equivalent to a listed impairment.  The evidence shows the condition satisfies the twelve-month durational requirement because Snider has been diagnosed with cirrhosis, alcoholic liver disease, and hepatitis C for many years.  Although the ALJ acknowledged that Dr. Reed's assessment was suspect because Dr. Reed did not have Snider's later test results, neither the ALJ nor the Appeals Council addressed the Snider's subsequent showing that his symptoms had worsened.

The court finds the ALJ also erred in several other respects.  There is no substantial evidence to support the finding that Snider can perform work at the medium or light exertional level.  Snider's back and shoulder injuries are documented by objective medical evidence.  His lifting restriction is also well-documented in the record and there is no evidence to suggest that the impairments that triggered those restrictions (that is, a rotator cuff injury limiting range of motion and residual iguinal hernia pain and hemorrhoids requiring a lifting restriction) have resolved.  The ALJ also failed to consider the effects of Snider's impairments in combination.  In addition to the liver disease issues, objective evidence shows Snider has been diagnosed with COPD and thrombocytopenia.

Further, the ALJ did not properly consider Snider's subjective complaints.  Objective medical evidence in the record establishes that Snider has several conditions that could reasonably be expected to cause his symptoms.  He testified to pain, weakness, and fatigue.  Snider's daily activities provide no reason to doubt the credulity of his complaints. The ALJ also erred in relying on Snider's felony drug conviction in her credibility analysis. Snider was not convicted of a crime, such as fraud, that involves a propensity for not telling the truth.  The ALJ's reliance on Snider's ostensible failure to obtain treatment is similarly

unavailing.   The fact that Snider could not afford treatment is corroborated by his physician's notes indicating that finances were the limiting factor in  treatment decisions. Snider's lack of financial resources justifies his failure to seek medical attention. Additionally, the record shows that Snider's hepatitis C would not be responsive to treatment in any event.  The ALJ's conclusion that Snider's symptoms were controlled by medication is also unsupported.  The record shows no more than that Snider's diuretics helped somewhat with edema.

Snider has been diagnosed with cirrhosis of the liver, a debilitating and progressive disease.  That diagnosis is supported by imaging evidence in this case, but can only be conclusively established by a liver biopsy.  The Social Security Administration will not obtain a liver biopsy.  Once cirrhosis progresses to end-stage liver disease, the only treatment is a liver transplant.   Snider's failure to obtain costly and likely ineffective treatments does not indicate lack of credibility in these circumstances.

The opinion of the vocational expert cannot constitute substantial evidence to satisfy the Commissioner's burden to show there are other jobs in the national economy that Snider can perform despite his impairments.  The vocational expert was not asked a hypothetical question that captured the concrete consequences of Snider's numerous impairments.  Application of the medical-vocational grids would direct a finding of disability in Snider's case.  He is a man closely approaching advanced age with a limited education and no transferrable skills.  "Where the record overwhelmingly supports a disability finding and remand would merely delay the receipt of benefits to which plaintiff is entitled, reversal is appropriate." *Thompson v. Sullivan*, 957 F.2d 611, 614 (8th Cir. 1992).  The evidence

overwhelmingly supports a finding of disability and a remand to the Commissioner would only delay benefits.  Accordingly,

IT IS ORDERED:

1.  This action is remanded to the Commissioner with instructions to award benefits.

2.  Any motion for attorney fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, shall be filed within 30 days of the date of this order; any objection thereto shall be filed within 30 days thereafter.

3.  A judgment in accordance with this Memorandum and Order will issue this date.

DATED this 2nd day of August, 2012.

BY THE COURT:


s/ Joseph F. Bataillon
U.S. District Court Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.